FILED
08/11/2021
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 1, 2021

**IN RE MYNAJAH S.**

**Appeal from the Juvenile Court for Washington County**
**No. 43107     Sharon M. Green, Judge**

_____

**No. E2021-00040-COA-R3-PT**

_____

Mother appeals the termination of her parental rights on the grounds of severe abuse, abandonment by failure to visit and support, persistence of conditions, and failure to manifest an ability and willingness to assume physical custody or financial responsibility for the child. We affirm the trial court's rulings as to both grounds for termination and best interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and W. NEAL MCBRAYER, JJ., joined.

Elizabeth A. Brady, Johnson City, Tennessee, for the appellant, Leslie S.

Dustin D. Jones, Johnson City, Tennessee, for the appellees, David G. and Michelle G.

**OPINION**

### I.     FACTUAL AND PROCEDURAL HISTORY

The child at issue was born to Respondent/Appellant Leslie S. ("Mother") in February 2018. Her umbilical cord was tested at birth and showed that the child had been exposed to amphetamines, methamphetamine, buprenorphine, cocaine, and cannabinoids in utero. As a result, Tennessee Department of Children's Services ("DCS") received a referral for a drug-exposed child on February 6, 2018. The child experienced symptoms related to the drug exposure and received treatment. Because Mother's own drug screening indicated that Mother was clean other than a prescribed medication, the child was permitted to leave the hospital with Mother. Later that month, the child was admitted to the hospital

for "RSV."[1] The child was later discharged from her pediatrician's office due to several missed appointments. During this time, DCS attempted to drug test Mother on a few occasions. Even after the DCS worker waited for hours, Mother was unable to produce samples "many times."

Around April 10, 2018, Mother contacted DCS for help with the child. At that point, Mother had taken the child to the emergency room on multiple occasions for breathing issues; other than the single incident of RSV, however, the doctors could find nothing wrong with the child. As a result, Mother told then-DCS investigator Breanna Ellison[2] that "she did not feel like her child was safe in her care because she didn't know if the medical issues were due to herself or what was going on." When Ms. Ellison arrived, she learned that Mother had been drug tested at Woven, the outpatient drug program that Mother was participating in, and tested positive for methamphetamine. Mother denied using this drug, but expressed to Ms. Ellison her concern that the child could also have been exposed to methamphetamine through her formula. Mother asked that the child be placed with Petitioners David G. ("Foster Father") and Michelle G. ("Foster Mother" and, together with Foster Father, "Petitioners"), who were friends of the child's maternal grandmother. The child was immediately placed with Petitioners, where she remained throughout trial.

On April 20, 2018, DCS filed a petition in the Juvenile Court of Johnson City (the "juvenile court" or the "trial court") to declare the child dependent and neglected. The petition noted that DCS was asking Mother to complete the following actions in order to regain custody of the child:

1. Mental Health Assessment, following all recommendations;
2. Alcohol and Drug Assessment, following all recommendations;
3. Submit to random drug screening and/or pill counts;
4. Counseling, individual and/or family;
5. Counseling to address domestic violence issues;
6. Obtain and/or maintain stable housing;
7. Obtain and/or maintain a legal source of income;
8. Cooperate with DCS and/or other service providers;
9. Maintain regular contact/visitation with the [] chil[d] as allowable by the Court's order;
10. Financially support the chil[d] at all times that the chil[d is] not in the custody of the mother;
11. Comply with all court orders in this and any other matter;
12. Comply with the rules and regulations of DCS and the laws of the State of Tennessee and any other governmental entity;

---

[1] "RSV" is an acronym for respiratory syncytial virus. *Nunn v. State*, No. E2012-00324-CCA-R3-PC, 2012 WL 5991559, at *3 (Tenn. Crim. App. Nov. 30, 2012).

[2] Ms. Ellison had been promoted to supervisor by the time of trial.

13. Resolve all legal issues; and
14. Comply with all herein requirements in an expeditious manner.

Mother was appointed counsel to represent her in the dependency and neglect action.

On May 1, 2018, the child underwent hair follicle drug testing, which showed that the child had been exposed to methamphetamine and cocaine. The purpose of the hair follicle drug screening was to determine whether the child had been exposed to drugs in the prior three months. Although Petitioners sought medical treatment for the child after learning of her exposure, she fortunately did not experience any medical issues related to the drug exposure after her removal.

On or about July 28, 2018, the juvenile court entered an order finding the child dependent and neglected based on Mother's stipulation. Therein, the trial court noted that Mother was "in agreement to comply with all services listed in the petition" and that she was required to complete a mental health assessment and follow all recommendations, submit to random drug screens by DCS, and comply with all of the services listed in the petition. Mother was permitted supervised visitation, which she exercised sporadically. Sometimes Mother was "excessively late. Sometimes she would not show at all."

On May 1, 2019, however, Mother submitted to a drug screening during a visitation at a fast food restaurant. The test indicated that Mother was positive for cocaine only. Mother denied using cocaine, but admitted using marijuana in the prior week. DCS offered to retest Mother using a hair follicle test, but Mother refused because she did not want to damage her hair. Following the May 1, 2019 drug test, there is no dispute that Mother's visitation with the child was suspended until she could produce two consecutive clean drug screens.[3]

After the May 2019 drug test, Mother failed to keep in contact with DCS. As a result, the DCS case was closed by order of the trial court on August 14, 2019.[4] Temporary custody of the child was awarded to Petitioners, but the trial court ruled that the child would remain within the jurisdiction of the juvenile court. At some point thereafter, Mother's counsel in the dependency and neglect proceeding was relieved of the appointment due to lack of contact with Mother.

On December 6, 2019, Mother filed a pro se petition in juvenile court to be returned custody of the child. Therein, Mother asserted that she had held a stable job for over a year and that she "can pass a drug test."[5] The petition was dismissed, however, when Mother

---

[3] There is no order reflecting this ruling in the record. But Mother conceded at trial that she was aware of this requirement.

[4] Despite the fact that the DCS case was closed, Ms. Ellison was ordered to appear at the next hearing, and Mother was ordered to keep both her attorney and DCS informed of her whereabouts.

[5] Much of Mother's petition is difficult to read, as it is handwritten and Mother's writing is very

- 3 -

did not appear for the hearing scheduled for January 23, 2020.

Petitioners filed a petition to terminate Mother's parental rights on February 4, 2020.[6] The petition alleged as grounds abandonment by failure to visit and support, persistent conditions, severe abuse, and failure to manifest an ability and willingness to assume physical custody or financial responsibility for the child. Mother was appointed counsel, and a guardian ad litem was appointed for the child. Mother, through counsel, filed an answer to the petition on May 26, 2020. Therein, she admitted that she had not visited with the child in the four months preceding the filing of the petition, but alleged that her failure to do so was not willful. Mother further denied that she willfully failed to support the child, as she wrongly believed that child support payments were being deducted from her paycheck.

A trial on the petition was held on October 30, 2020. The proof showed that Mother successfully completed inpatient drug treatment at Buffalo Valley at some point in the case. According to Mother, following inpatient rehabilitation, she was clean for a time, but she "fell back and starting using again[.]" At the conclusion of her stint at Buffalo Valley, the program recommended that Mother continue with intensive outpatient treatment. Mother began this treatment, but never completed it. According to Ms. Ellison,

> She engaged with intensive out-patient, but she would start the program and then miss so many appointments and she would have to restart. I believe she had to restart a couple of different times. She has not yet completed the program. We also tried to get her connected with Watauga Mental Health to get the mental health assessment but we were not successful in those endeavors with her.

Mother admitted that she now understood the purpose of the follow-up treatment, but admitted that she never completed it, citing scheduling and financial concerns. Mother also admitted that she never obtained a mental health assessment, again citing scheduling issues.

Mother often cited financial and scheduling issues as the cause of her failures in this case. For example, Mother testified that she was sick on the day her petition to be returned custody of the child was to be heard and that she went to the hospital, but was only diagnosed with a cold. Mother claimed that she tried to call the court to inform it of the issue but could not get through. Mother admitted that she did not take any action to refile her petition after it was dismissed. Mother claimed similar issues occurred when she tried to complete the outpatient treatment and the mental health assessment.

---

faint.

[6] The petition also asked that the child's biological father's rights be terminated. At trial, counsel for the Petitioners stated that the father had surrendered his parental rights. Regardless, he is not a party to this appeal.

Despite not completing the follow-up care recommended following her outpatient treatment and therefore required by the juvenile court, Mother claimed to be over seventeen months sober at trial. Essentially, she testified that she became sober immediately following the May 1, 2019 drug test. Mother submitted as proof one drug test commissioned by her on September 21, 2020; this test showed that Mother was negative for all tested substances. The guardian litem requested additional testing before trial, resulting in an October 28, 2020 drug test that showed that Mother was positive for amphetamines. Mother, however, produced a valid prescription for phentermine. According to Mother, she attended a weight loss clinic that had prescribed this medicine for her health. The cost of this treatment was $60.00 per month. Mother admitted that she did not inform the medical provider of her history of substance abuse. Maternal grandmother supported Mother's testimony that she was now sober and stable.

Petitioners both testified at trial. The proof showed that Mother had not visited or paid any monetary support during the four months prior to the termination petition being filed.[7] According to Petitioners, Mother did not contact them at all during that time to seek visitation; Mother did not deny a lack of communication during the relevant period, but claimed that she lost Petitioners' phone number when she received a new phone. Although Mother had sporadically contacted Petitioners prior to the four-month period, Mother never produced to Petitioners any negative drug testing that would have allowed visitation to resume.

With regard to support, Mother testified that she believed that support for the child was being deducted from her pay check, as it was for her other two children who were not in her custody. Mother claimed that she did not learn about the lack of support until after the petition was filed, as she is paid by direct deposit and does not see her paycheck. Mother admitted that she worked consistently throughout the relevant period, that she had funds left over even after paying all of her bills, and that she sometimes received funds from third parties.

Mother's housing was also at issue. Ms. Ellison testified that during her time on the case, Mother was generally homeless. Mother testified, however, that she lived with her mother until she signed a lease in March 2020 on a two-bedroom apartment. The second bedroom was occupied by Mother's older two children, who she does not have custody of but stay with her informally two nights per week. If returned to Mother, the child would stay in Mother's room until a three-bedroom apartment could be located. A friend who testified on behalf of Mother, however, explained that there had been an unsuccessful effort to evict Mother from her apartment due to the volume of her children's play. Mother also

---

[7] There was some testimony that Mother provided a Christmas gift for the child, but the year was unclear. Christmas 2019 was in the four-month period. However, as discussed *infra*, there is no dispute that Mother did not pay monetary support during the relevant time period.

presented proof of a valid driver's license and insurance on her vehicle.

Petitioners testified about the child's life in their home, where she is closely bonded to both Petitioners and their children. According to Foster Mother, the child "is absolutely a 'daddy's girl'" who wants to be around Foster Father at all times. The child calls Petitioners "Mommy" or "Momma" and "Daddy" and knows them to be her parents. According to Petitioners, the child does not know Mother at all and would be harmed if removed from their care. As Foster Mother explained, "I think she would be lost. I don't think she would know what to do. . . . I can't imagine her being able to function."

The trial court entered an order terminating Mother's parental rights on December 9, 2020. On January 11, 2021, Mother filed a motion for relief from the final judgment under Rule 60.02 of the Tennessee Rules of Civil Procedure. Therein, Mother asserted that the final order included an incorrect address for Mother's counsel and that she therefore did not receive timely notice of the termination order so as to file a timely notice of appeal. An amended order terminating Mother's parental rights was filed on January 12, 2021. The order terminated Mother's parental rights on the grounds of abandonment by failure to visit and support, persistence of conditions, severe abuse, and failure to manifest an ability and willingness to assume physical custody or financial responsibility for the child. The trial court further found that termination was in the child's best interest. The trial court designated its ruling as final under Rule 54.02 of the Tennessee Rules of Civil Procedure.[8] The trial court also granted Mother's Rule 60.02 motion by order of January 14, 2021, finding that the address for Mother's counsel was incorrect on the certificate of service and that a new order should be entered so as to allow Mother the full thirty days to appeal. Mother thereafter timely appealed.

## II.    ISSUES PRESENTED

As we perceive it, this appeal involves the following issues:

1. Whether the trial court correctly found clear and convincing evidence of grounds to terminate Mother's parental rights?
2. Whether the trial court correctly found clear and convincing evidence that termination was in the child's best interest?

## III.  STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state

---

[8] The amended order did not address the termination of the father's parental rights. As previously stated, in opening statements at trial, Petitioner's attorney asserted that he had surrendered his parental rights prior to trial.

constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). Therefore, "parents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *Id.* at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." *Id.* at 522 (citations and quotations omitted). "Clear and convincing evidence is evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (quotation marks and citation omitted).

In Tennessee, termination of parental rights is governed by statute, which identifies "'situations in which [the] state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence: (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *See In re Valentine*, 79 S.W.3d at 546.

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *See* Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523–24 (citations omitted). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* at 524 (citation omitted).

## IV. DISCUSSION

### A. Grounds for Termination

### 1. Severe Abuse

A ground for termination exists when

> The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

Tenn. Code Ann. § 36-1-113(g)(4). Severe child abuse is defined as, *inter alia*: "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death[.]" Tenn. Code Ann. § 37-

- 7 -

1-102(b)(27). "[T]this Court has repeatedly confirmed that severe child abuse can be based on a mother's prenatal drug use." *In re Kolton C.*, No. E2019-00736-COA-R3-PT, 2019 WL 6341042, at *4 (Tenn. Ct. App. Nov. 26, 2019) (citing cases); *see also* *In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *8 (Tenn. Ct. App. Oct. 29, 2018) ("For over a decade, this Court has held that prenatal drug use constitutes severe child abuse for purposes of terminating parental rights."). Likewise, exposing a child to drugs once he or she is born can also constitute severe abuse. As this Court explained,

> [I]t is disingenuous to suggest that, while prenatal exposure constitutes severe abuse, postnatal exposure does not. The fact that the child is exposed to drugs after birth does not make the parents any less accountable for their actions toward their children. It does not diminish the abuse or failure to protect the child. To hold otherwise would thwart the purpose of the statutes protecting juveniles. The public purpose in Tenn. Code Ann. § 37[-1-]101(a)(1) of "[p]rovid[ing] for the care, protection, and wholesome moral, mental and physical development of children" would not be furthered if we did not protect all drug-exposed children, regardless of whether the drug exposure was before or after birth. Children are entitled to a life free from the harmful effects of exposure to drugs.

*In re A.L.H.*, No. M2016-01574-COA-R3-JV, 2017 WL 3822901, at *3 (Tenn. Ct. App. Aug. 31, 2017).

Here, the trial court found that the child's umbilical cord tests indicated that the child was exposed to amphetamine, methamphetamine, buprenorphine, cocaine, and THC in utero. The trial court further found that a hair follicle drug screen performed on the child approximately three months later, on May 1, 2018, showed that the child had been exposed to methamphetamine and cocaine after being born. The trial court found that the child was not exposed to drugs while in the care of Petitioners, but through Mother.

On appeal, Mother contends that the positive umbilical cord test reflects only illicit drug use that occurred before she knew that she was pregnant and the use of prescribed drugs during medically-assisted rehabilitation. Mother also argues that the drug test performed on the child in May 2018 occurred after the child had been in Petitioners' custody for twenty days and that there was no testimony to pinpoint when the exposure occurred. Moreover, Mother points out that Petitioners were never drug-tested in this case. Mother also points out that the child was not in her exclusive control every second of her life and could have been exposed by family members or at "any number of public places."[9]

---

[9] We note that the three-month span of the hair follicle drug screening suggests that it could have covered approximately one single day in which the child was in utero. However, Mother does not assert in this appeal that the positive hair follicle drug screening reflects remnants of the child's in utero drug exposure.

As an initial matter, Mother's argument that the child could have been exposed by third parties or at a public place strains credulity. Essentially, this argument requires this Court to choose between the trial court's finding that a parent who is a known drug user exposed her child to some of the same illegal drugs that she had previously exposed the child to in utero, or that the child was exposed to these drugs by some unknown third party in the first three months of her life. Importantly, the clear and convincing standard does not require that the petitioners eliminate all doubt, but only serious or substantial doubt, about the correctness of the decision. *See* **Hodges v. S.C. Toof & Co.**, 833 S.W.2d 896, 901 n.3 (Tenn.1992) (holding that clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence."). Here, Mother tested positive for methamphetamine on or about April 10, 2018, approximately twenty days prior to the child's positive drug screen. Ms. Ellison testified that the child's drug screen indicated drug exposure at any point in the last three months. Moreover, when asked if Mother's drug use was "how [the child] got exposed to drugs," Mother's answer was simply that she could not "recall." These facts simply do not create serious or substantial doubt as to the trial court's conclusion that it was Mother that exposed the child to drugs following her birth.

The same is true of Mother's contention that it was Petitioners that exposed the child to drugs in the twenty days that she was in their custody. Again, the test performed on the child would indicate drug exposure not only recently, but in the three months prior to the test. Thus, the fact that the child was no longer in Mother's care at the time of the test is not dispositive. Here, Petitioners testified unequivocally that they did not use illegal drugs. While no drug tests were presented as proof, Foster Mother and Foster Father each testified without dispute that they are drug-tested at work and have never failed a drug test. Moreover, the trial court explicitly found that Petitioners were credible on this issue. "The trial court is in the best position to resolve factual issues that hinge on credibility and an appellate court will not re-evaluate a trial court's assessment of a witness's credibility absent clear and convincing evidence to the contrary." **Hutchings v. Jobe, Hastings & Assocs.**, No. M2010-01583-COA-R3-CV, 2011 WL 3566972, at *2 (Tenn. Ct. App. Aug. 12, 2011) (citation omitted).

From our review of the record, no clear and convincing evidence was presented to undermine the trial court's explicit credibility finding in favor of Petitioners on this issue. As such, the trial court was permitted to credit their testimony, regardless of the fact that drug screens for Petitioners were not presented as proof. Given the trial court's finding that Petitioners do not abuse drugs, it is far more likely that Mother, who was known to abuse drugs, was the person that exposed the child to drugs during this timeframe. Thus, regardless of Mother's arguments concerning her pre-natal drug use,[10] we conclude that Mother exposed the child to illegal drugs after her birth. As such, there was clear and

---

[10] We note, however, that Mother freely admitted to using marijuana during her pregnancy to help with morning sickness.

convincing proof that the child suffered from severe abuse.

## 2. Abandonment

Petitioners argue Mother's parental rights should also be terminated on the ground of abandonment by failure to visit and support, pursuant to Tennessee Code Annotated sections 36-1-102(1)(A)(i) and 36-1-113(g)(1). Section 36-1-113(g)(1) states that termination of parental rights may be based upon "[a]bandonment by the parent or guardian, as defined in § 36-1-102." Section 36-1-102(1)(A)(i), in turn, defines "abandonment" as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Failure to visit refers to

> the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation. That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant four-month period[.]

Tenn. Code Ann. § 36-1-102(1)(E). Failure to support generally

> means the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period.

Tenn. Code Ann. § 36-1-102(1)(D). In addition, "[a]bandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child." Tenn. Code Ann. § 36-1-102(1)(F).

> Under Tennessee Code Annotated section 36-1-102(1)(I), as amended,
> it shall be a defense to abandonment for failure to visit or failure to support
> that a parent or guardian's failure to visit or support was not willful. The
> parent or guardian shall bear the burden of proof that the failure to visit or

support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

"Proving an allegation by a preponderance of the evidence requires a litigant to convince the trier-of-fact that the allegation is more likely true than not true." *McEwen v. Tennessee Dep't of Safety*, 173 S.W.3d 815, 825 (Tenn. Ct. App. 2005) (citing *Austin v. City of Memphis*, 684 S.W.2d 624, 634–35 (Tenn. Ct. App. 1984)). "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005) (citing *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004)).

We begin with abandonment by failure to visit. The petition in this case was filed on February 4, 2020. As such, the relevant time period for determining this ground for termination is from October 4, 2019, to February 3, 2020. Mother admitted in her answer that she did not visit during this timeframe. Indeed, it appears from the proof that Mother's last visit with the child occurred on May 1, 2019. Mother asserts, however, that her failure to visit was not willful because there was no evidence that Mother was aware of her duty to visit the child and her visits were suspended by a court order. Moreover, Mother points to her action in filing a petition to resume custody on December 6, 2019, within the relevant four-month period.

The trial court acknowledged that Mother's visitation was suspended during the four-month period and that Mother did file a petition to be returned custody of the child during the four-month period. Nevertheless, the trial court found that Mother had not met her burden to show that her failure to visit was not willful where (1) her petition was dismissed on January 23, 2020 because she failed to appear for the hearing due to a cold; and (2) Mother made no effort to contact Petitioners during the four-month period to request visitation and their contact information was provided to Mother before she lost it.

We cannot conclude that the record preponderates against the trial court's determination that Mother failed to prove a lack of willfulness. *See generally Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) ("For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect."). Here, Mother was the party with the burden to show that her failure was not willful. *See* Tenn. Code Ann. § 36-1-102(1)(I). But Mother presented no evidence that she was unaware of her duty to visit. *See also In re M.L.P.*, 281 S.W.3d 387, 392 (Tenn. 2009) ("Persons are presumed to know the law, and parents should know that they have a responsibility to visit their children.") (internal citations omitted) (citing *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996); *Bd. of Educ. v. Shelby County*, 207 Tenn. 330, 339 S.W.2d 569, 584 (Tenn. 1960)); *see also In re M.L.P.*, No. W2007-01278-COA-R3-PT, 2008 WL 933086, at *13

(Tenn. Ct. App. Apr. 8, 2008), *aff'd* (Tenn. March 27, 2009) ("Because M.L.P. was not placed in the custody of an agency, such as DCS, no permanency plan was required that would include the notice provisions, and the statute was not violated."); *In re W.B., IV*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, at *11 (Tenn. Ct. App. Apr. 29, 2005) (holding that the statutory requirement that a parent be provided with the criteria and procedures for termination of parental rights does not apply when the termination is prosecuted by a private party rather than DCS or another agency).

It is true that Mother's visitation was suspended during the four-month period after she tested positive for cocaine;[11] Mother was informed that visitation with the child could resume if she passed two consecutive drugs screens. This Court has previously held that where a parent is ordered to fulfill certain conditions prior to the resumption of visitation, the failure to fulfill the conditions results in the parent's failure to visit being willful. *See, e.g., In re Jaylah W.*, 486 S.W.3d 537, 553 (Tenn. Ct. App. 2015), *perm. app. denied* (Tenn. Feb. 1, 2016) (holding that mother's failure to provide proof to the court that she had remedied the conditions that led to the suspension of visitation resulted in a finding that her failure to visit was willful, even though visitation had been terminated by the court); *In re Kiara C.*, No. E2013-02066-COA-R3-PT, 2014 WL 2993845 (Tenn. Ct. App. June 30, 2014) ("This Court has often held that when a parent's visitation has been suspended by the trial court and the parent has the ability to demonstrate a change in situation or behavior that would warrant reinstating visitation but fails to do so, that parent can be found to have willfully failed to visit."). After this drug screening, however, Mother failed to maintain any contact with DCS, which had previously been offering Mother drug screening. And Mother made no effort to obtain drug screenings on her own until the months immediately before trial. Mother claimed, however, that she could not afford drug testing until immediately prior to trial. But the proof shows that DCS was providing Mother with multiple opportunities for free drug testing prior to the four-month period; it was Mother's non-compliance that led the DCS case to be closed. Moreover, Mother presented no evidence of the cost of drug testing. She did insist, however, that she had additional funds each month after paying her bills, and for some period of time was paying $60.00 per month to attend a weight loss clinic that provided her with a prescription for amphetamine. Under these circumstances, we cannot conclude that Mother met her burden to show that she was financially unable to undergo the testing, and consequently that her failure to visit (because she could not provide two negative tests) was not willful.

Mother, however, did file a petition to resume visitation with the child in December 2019. But her petition was dismissed when she failed to appear for the hearing. According to Mother's own testimony, although she went to the hospital on this date, she was ultimately diagnosed with "just a regular cold." Mother also claimed that she called the court but was unable to get through; this was similar to Mother's other claims about why

---

[11] Mother denied using cocaine but admitted using marijuana. DCS offered Mother retesting at that time, but she refused, citing concerns that her hair would be damaged.

she failed to complete necessary tasks. Mother also admitted that she made no effort to reinstate her petition after it was dismissed. Additionally, it does not appear that Mother had undergone any successful drug screening by the time of the January 2020 hearing on her petition to be returned custody; as such, even if she had appeared or re-filed, her effort to regain contact with the child still did not meet the requirements of the prior order suspending her visitation and was half-hearted at best. Under these circumstances, we conclude that the trial court did not err in finding that Mother failed to demonstrate that her failure to visit the child during the four-month period was not willful.

We next consider failure to support. Again, for purposes of this ground for termination, the relevant period is from October 4, 2019, to February 3, 2020. Here, again, there is no dispute on appeal that Mother did not pay child support during this period or that Mother had the capacity to pay support.[12] Instead, she argues that her failure was not willful because she believed that child support was being deducted from her paycheck.

The trial court did not credit Mother's explanation, however. Instead, it found that Mother knew that she had a duty to financially support the child and had the ability to pay support. The trial court further found as follows:

> Mother's asserted lack of willfulness is predicated upon child support reportedly being withheld from her wages for her two other children, who she does not have custody of. Her defense is that she thought the deductions were also for the child in these proceedings. She filed a print-off of a "UPR Check Inquiry Report" from her employer dated September 21, 2020, as an exhibit to her testimony, but the court is not able to interpret the information on this report as including deductions for a child support wage assignment in the format in which it is presented. Mother has not filed any documentation from Child Support Central Receipting Unit which would verify child support being withheld from her wages for this child or her other two children.

As an initial matter, we agree with the trial court that the documentary proof of Mother's payment of child support for her other two children is not helpful. First, the "UPR Check Inquiry Report" is rather unintelligible; there is no clear indication as to what any of the deductions are and nothing that expressly designates any deductions as being for child support. Moreover, the pay period that appears to be referenced in the report spans from September 4, 2020, to September 18, 2020; it is therefore of no value in determining whether Mother was paying child support for her other children during the four-month

---

[12] Foster Father testified that he had received one child support payment after the filing of the termination petition. However, "[a]bandonment may not be repented of by resuming . . . support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child[.]" Tenn. Code Ann. § 36-1-102(1)(F).

children, much less in determining whether her failure to support the child at issue was willful.

Thus, we are left only with Mother's unsubstantiated testimony that she was unaware that child support was not being paid for the child. Even if we were to credit Mother's claim of lack of knowledge, however, at best, it shows a lack of effort on Mother's part to investigate or ensure that her child was financially supported. Essentially, even after being served with a petition to set child support, Mother argues that she did not act willfully because she did not act at all. However, this Court has often found that a lack of effort constitutes abandonment. *See, e.g.*, ***In re Bos. G.***, No. M2019-00393-COA-R3-PT, 2020 WL 2070399, at *3 (Tenn. Ct. App. Apr. 29, 2020) (affirming the ground of abandonment by failure to establish a suitable home due to the parent's "lack of effort"); ***In re P. G.***, No. M2017-02291-COA-R3-PT, 2018 WL 3954327, at *11 (Tenn. Ct. App. Aug. 17, 2018) (affirming the finding of abandonment by willful failure to visit where the parent "made no effort" to resume a relationship with the child); ***In re Serenity L.***, No. E2014-02475-COA-R3-PT, 2015 WL 4594520, at *12 (Tenn. Ct. App. July 31, 2015) (affirming the trial court's finding that the parent's "failure clearly and convincingly shows a lack of effort or interest in having any relationship with the child, and accordingly, constitutes abandonment under [section] 36-1-102."). The same is true here. Nothing in the record indicate that Mother made any effort to ensure that her child was being financially supported. At best, Mother made no effort to investigate whether support was being paid for the child; she merely assumed that it was. Moreover, no evidence was presented that Mother was in any way prevented from undertaking an investigation into the support being paid for the child. This failure is especially difficult to overlook because Mother testified that she was served with a child support petition around the time that the four-month period began; but Mother testified to no efforts whatsoever to respond to that petition or ensure that support was being paid after that petition was filed. This proof is simply not sufficient to meet her burden to show that her failure to support was not willful.

### 3. Persistence of Conditions

The next ground Petitioners rely on is persistence of conditions, pursuant to Tennessee Code Annotated section 36-1-113(g)(3):

(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further

- 14 -

abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

As we have previously explained,

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at *6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion [] that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

*In re Navada N.*, 498 S.W.3d 579, 605–06 (Tenn. Ct. App. 2016).

Here, there is no genuine dispute that the child was removed from Mother's custody by an order of the juvenile court in a dependency and neglect action or that the child had been removed from Mother's care for over six months by the time of trial. Instead, on appeal, Mother argues that conditions do not continue to exist that prevent the child from being returned to her care. In support, Mother cites her two negative drug screens, her testimony that she had been sober since May 2019, her stable housing and employment, the fact that she had proper transportation, and the fact that she has been allowed

- 15 -

unsupervised visitation with her older children.

The trial court, however, found otherwise. First, the trial court was concerned about the stability of Mother's housing:

At the time o[f] the trial on the Petition to Terminate Parental Rights, Mother had obtained housing (with utilities) at Royal Circle, Johnson City, Tennessee in March, 2020. There was no proof that she had had housing at any time prior to March, 2020. One of Mother's witnesses testified that the neighbors do not like Mother's other two children playing outside when they visit her. He testified that the apartment manager "hassles" her because her children are playing outside and that the apartment complex had unsuccessfully tried to have her evicted. The witness was, himself, on the no trespass list at the apartment complex.

The trial court was also concerned about Mother's sobriety:

Mother had completed inpatient drug rehabilitation in 2018 prior to the filing of the dependency and neglect petition, but she had not completed the discharge recommendations that she complete intensive outpatient treatment with WOVEN. The proof is that she did not ever successfully complete the Woven Program with Families Free which would have satisfied that requirement. Mother's last drug screen (prior to September, 2020) was in May, 2019, on which she tested positive for cocaine. She did not cooperate with the Department of Children's Services after May, 2019, to complete any additional drug screens or drug tests and, after she stopped coming to multiple court hearings and stopped maintaining contact with the Department of Children's Services, her DCS case was closed.

On September 21, 2020, which was approximately six (6) weeks before this trial, Mother obtained a drug screen for herself which was negative for all substances. The court is of the opinion that the drug screen obtained by Mother at such time as she chooses is not random and is of limited value. Mother's testimony was that September, 2020, was the first time she had the financial ability to pay for a drug screen. On October 28, 2020, the Guardian ad Litem requested Mother to submit to a random drug screen, which she did, and the results were clean with the exception of amphetamines. There is a hand-written statement on the line next to the positive amphetamine result which states ["]RX for phentermine 37.5 mg." Mother's testimony was that the monthly cost of the prescription was $60.00 and [she] did not remember the name of the doctor who prescribed the phentermine for her. There was no explanation as to why the September 21, 2020, drug screen just one month earlier did not show the phentermine in her system. Mother acknowledged that she did not disclose her history of drug

abuse to the weight loss clinic.

There is no evidence of best medical practices concerning an individual with a history of drug abuse including methamphetamine and cocaine obtaining a prescription for an amphetamine-type substance for weight loss. There was not a request for the court to consider medical journals such as the Physicians' Desk Reference concerning phentermine use by persons having a history of substance abuse. Mother testified that she did not tell the weight loss clinic who prescribed the phentermine of her prior substance abuse history. The Court has observed Mother during these proceedings and she does not appear obese by any means.

Based on these factual findings, particularly Mother's failure to participate in aftercare or a mental health assessment, the trial court found that the primary conditions that led to the child's removal had not been remedied. Thus, it is apparent that much of the trial court's focus as to this ground was on Mother's drug abuse. After our review of the record, we agree with the trial court's determination.

Here, the record shows that Mother used illegal drugs during her pregnancy. In fact, Mother admitted to using at least one illegal, unprescribed substance even after she became aware that she was pregnant. Later drug tests showed that she used drugs after the child was born, despite the child suffering from drug withdrawal symptoms at her birth. Mother often denied her drug use or deflected any blame for her drug dependency. DCS often asked Mother to participate in drug testing while it was involved in this case; Mother often was "unable" or refused to participate in drug testing, suggesting that she may have been aware that drug-testing would indicate continuing drug use. Moreover, Mother's drug use continued even after she successfully completed in-patient drug rehabilitation. Mother testified, however, that she had been clean for "a long time. I guess since the last drug screen [in May 2019]." But Mother presented no proof to support her claim of sobriety of such a long duration. Instead, she presented drug screens showing only that she was clean from drugs on September 21, 2020 and clean from drugs other than prescribed phentermine in October 2020. Thus, at best, these drug tests indicate that Mother was clean for around thirty days at the time of trial.

In the absence of documentary proof supporting Mother's claim to being clean as early as May 2019, we cannot find fault in the trial court's implicit decision to discredit her testimony on this issue. Here, Mother used drugs to such an extent during her pregnancy that the child suffered withdrawal symptoms. Even crediting her testimony that she stopped using many drugs once she learned of her pregnancy, the proof shows that it was necessary for Mother to attend a subutex clinic "[s]o that [she] did not do any illegal drugs" during her pregnancy. Moreover, Mother did not stop using all illegal drugs, as she continued to abuse marijuana throughout her pregnancy. And Mother's drug use soon returned even after she successfully completed in-patient drug treatment. Despite this relapse, Mother refused to complete the required aftercare—intensive outpatient treatment—because she

was "having issues with drug screening"; we take this to mean that she did not continue treatment because she was still abusing drugs. This conclusion is supported by the fact that Mother often denied any drug use, only to then refuse to participate in drug tests administered by DCS or to test positive once she was finally tested. But Mother then asks us to believe, based on her testimony alone, that immediately following the May 2019 positive test, she became clean and stayed that way for seventeen months without any further treatment. The trial court apparently did not believe Mother on this issue, and nothing in the record leads us to a different conclusion.

While she again denies that it was her fault, Mother also failed to complete the mental health assessment required by the trial court. *See In re Navada N.*, 498 S.W.3d at 605 (indicating that willfulness is not required to prove this ground). And after Mother was able to produce a single clean drug screen in September 2020, Mother chose to go to a weight loss clinic to obtain a prescribed amphetamine. She did not, however, inform the provider of her substance abuse issues. While Mother may have been prescribed this treatment, it is clear that the trial court questioned Mother's judgment in engaging in this conduct so close to trial when her sobriety was clearly in issue.

Thus, the proof shows that Mother's drug abuse issues were of such an extent that she required considerable support in obtaining sobriety. Even with this support, however, she was unable to maintain her sobriety for any significant documented period of time and she often denied abusing drugs, only to then refuse to complete drug testing or test positive for illegal substances. And now, Mother is receiving no support or treatment of any kind to address her substance abuse issues, but contends that this Court should believe her unsupported testimony that she has been sober for over a year. Moreover, Mother has obtained a prescription from a weight loss clinic and was back to taking an amphetamine the month that she knew the parental rights trial was taking place. Under these circumstances, we cannot conclude that Mother has taken the steps necessary to demonstrate that her drug issues have been remedied in the long-term. *See, e.g., In re Riley W.*, No. E2017-01853-COA-R3-PT, 2018 WL 1256222, at *12 (Tenn. Ct. App. Mar. 12, 2018) (considering, inter alia, that the parents "have not addressed their illegal drug use"). And because of the length of time that Mother has been aware of the need to address these issues without significant progress, even with the help of DCS initially, it appears unlikely that she will be able to make sufficient progress in the near future to allow a safe return of the child to her home. *See In re James W.*, No. E2020-01440-COA-R3-PT, 2021 WL 2800523, at *13 (Tenn. Ct. App. July 6, 2021) (quoting *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)) ("When efforts made by DCS to help 'improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified.'").

Finally, we conclude that continuing the relationship with Mother deprives the child

of early integration into a safe, stable, and permanent home. Here, Mother was unable to demonstrate beyond her own unsupported testimony even two months of being clean from drugs by the time of trial; indeed, her most recent drug screen showed that she was using amphetamines, although she did have a prescription for that drug. Mother also failed to complete many of the tasks necessary to ensure her sobriety, including intensive outpatient treatment and a mental health assessment. In contrast, the child is in a loving, stable home that wishes to adopt her. Under these circumstances, the trial court did not err in finding that all of the elements of this ground for termination were met by clear and convincing evidence.

### D. Failure to Manifest a Willingness and Ability to Assume Custody

The final ground upon which Petitioners rely is that Mother failed "to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody . . . of the child[ren], and placing the child[ren] in [Mother's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). As explained by our supreme court:

> [S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (citation omitted).

We begin with the willingness and ability prong. "Ability focuses on the parent's lifestyle and circumstances." *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019) (citing *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018)). "When evaluating willingness, we look for more than mere words." *Id.* (citing *In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018)). "Parents demonstrate willingness by attempting to overcome the obstacles that prevent them from assuming custody. . . ." *Id.* Although we may consider evidence both before and after the petition was filed, *see In re Maya R.*, 2018 WL 1629930 at *7, a parent's ability and willingness may be measured as of the time the petition is filed. *See In re Serenity W.*, 2019 WL 511387, at *7 (citing *In re M.E.N.J.*, No. E2017-01074-COA-R3-PT, 2017 WL 6603658, at *7 (Tenn. Ct. App. Dec. 27, 2017)).

Here, we conclude that Petitioners have shown, at least, that Mother failed to demonstrate a willingness to parent or take financial responsibility for the child. As previously discussed, other than a few sporadic gifts given to the child, Mother made no

effort to ensure that the child was receiving financial support from her, despite her admitted ability to do so. By the same token, prior to the filing of the termination petition, Mother made no effort to comply with the juvenile court's order that she obtain two consecutive negative drug screens in order to even resume visitation with the child. Even her attempt to regain custody in her December 2019 petition was desultory at best, given her failure to obtain the drug screens required to resume visitation. Thus, Petitioners met their burden to show that Mother failed to manifest a willingness to either assume custody of the child or take financial responsibility for her.

The second prong of this ground involves whether the children would suffer substantial harm if returned to her custody. As we have explained regarding this prong:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

The trial court here found that removing the child from Petitioners' home and placing her with Mother would pose a substantial risk of harm to the child. We agree. In addition to Mother's failure to properly address her drug abuse issues, discussed supra, the testimony in this case demonstrates that the child does not know Mother at all. This Court has previously held that the substantial harm element can be proven when the evidence shows that the parent is a virtual stranger to the child. *See, In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020), *perm. app. denied* (Tenn. Dec. 10, 2020) ("[T]here can be no dispute that Father is a virtual stranger to the child. Other cases have held in similar situations that forcing the child to begin visitation with a near-stranger would make psychological harm sufficiently probable."); *In re Antonio J.*, No. M2019-00255-COA-R3-PT, 2019 WL 6312951, at *9 (Tenn. Ct. App. Nov. 25, 2019) (holding that substantial harm could be established when a child was removed from a home when very young and had nightmares out of fear of being removed from his foster family); *State v. C.H.H.*, No. E2001-02107-COA-R3-CV, 2002 WL 1021668, at *9 (Tenn. Ct. App. May 21, 2002) (holding that removal from the child's current family and placement with a near-stranger could constitute substantial harm).

Here, the child was approximately three months old when placed with Petitioners. By the time of trial, Mother had not visited with the child in approximately one-and-one-half years, the majority of her life. As a result, the child does not know Mother and believes

that Petitioners are her parents. The Petitioners have therefore presented sufficient proof that the child would likely suffer substantial psychological or emotional harm if returned to Mother's custody at this juncture.

## B. Best Interest

Because we have determined that at least one statutory ground has been proven for terminating Mother's parental rights, we must now decide if Petitioners have proven, by clear and convincing evidence, that termination of Mother's rights is in the child's best interests. Tenn. Code Ann. § 36-1-113(c)(2); *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). If "the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child." *In re Navada N.*, 498 S.W.3d at 607.

The statutory factors that courts should consider in ascertaining the best interest of the children include, but are not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care

for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).[13] "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005) (citations omitted).

As to the first factor, the trial court found that Mother failed to make a lasting adjustment of circumstances so as to make a return of the child safe, due to Mother's failure to complete substance abuse treatment or a mental health assessment. *See* Tenn. Code Ann. § 36-1-113(i)(1) (involving a lasting adjustment of circumstances). As a result, the trial court found this factor weighed in favor of termination. As previously discussed, Mother did not complete the required aftercare following her outpatient treatment and continued to use drugs for some time thereafter. Mother also has not completed a mental health assessment. Mother did prove that she was taking only prescribed substances in the month before trial. However, given Mother's lack of completed outpatient treatment and her history of relapse, we conclude that this progress is "too little, too late" to show a lasting change. *Cf.* *State v. K.L.K.*, No. E2003-2452-COA-R3-PT, 2004 WL 1496317, at *14 (Tenn. Ct. App. July 6, 2004) (holding that a parent's changes were not "too little, too late" and therefore were sufficient to show a lasting adjustment of circumstances).

The proof in this case further shows that while DCS was removed from this case at the end of May 2019, it had previously worked with Mother to obtain various services to help with her drug addiction. *See* Tenn. Code Ann. § 36-1-113(i)(2) (involving a lasting adjustment of circumstances after reasonable efforts by social services such that a lasting adjustment does not appear possible). Still, the trial court found that because "the DCS case had been closed for so long, this factor does not weigh in favor of termination of [] Mother's parental rights." Petitioners do not specifically challenge the trial court's finding as to this factor. As such, it is affirmed.

---

[13] This is the version of section 36-1-113(i) that was in effect when the termination petition was filed. The Tennessee General Assembly amended the statutory best interest factors in 2021. *See* 2021 Tenn. Laws Pub. Ch. 190 (S.B. 205), eff. April 22, 2021. Neither party asserts that the revised version of the statute is applicable in this case.

Next, the trial court found that Mother had not maintained visits or contact with the child since May 1, 2019, nor had she even tried to contact Petitioners to obtain visitation. *See* Tenn. Code Ann. § 36-1-113(i)(3) (involving the visitation maintained by the parent with the child). As a result, she had not seen the child in over a year by the time of the hearing. Mother disputes this finding in her brief, blaming her lack of visitation on DCS's failure to provide her with services. Respectfully, we disagree.

It is true that DCS closed its case with Mother in May 2019, terminating the services that had previously been offered to Mother, including the drug testing necessary for her to regain visitation. But the proof shows that when DCS offered Mother drug testing prior to May 2019, she often failed to participate or claimed an inability to produce a sample after DCS waited hours. It was Mother's own failure to comply that resulted in the closure of the DCS case and the suspension of the services that had previously been offered. After DCS closed its case, it was Mother's responsibility to do what was necessary to resume visitation. And there is no dispute that she did not attempt to obtain any drug testing until a month before trial.

Mother's claim that it was only a financial barrier that prevented her from obtaining the drug testing necessary for visitation to resume also rings false. Mother insisted at trial that she had extra funds each month after paying her bills. This contention was buttressed by Mother's choice to pay $60.00 per month for weight loss medications. Thus, Mother's own testimony indicates that she had extra money in which to set aside for drug testing in the sixteen months between the May 1, 2019 drug test and the first drug test she finally obtained. This factor heavily favors termination.

The same is true of the factor concerning the meaningful relationship between the parent and the child. *See* Tenn. Code Ann. § 36-1-113(i)(4). As the trial court correctly found, Mother and the child had not seen each other at the time of trial for seventeen months, more than half of the child's life. Petitioners both testified that the child would not know Mother if she saw her. This factor weighs heavily in favor of termination.

So too does the factor concerning a change in caretakers. *See* Tenn. Code Ann. § 36-1-113(i)(5) (involving the effect of change in caretakers on the child's health). The trial court specifically found that Petitioners' home is the only home the child has ever known and that the child knows Petitioners as "Mommy" and "Daddy." Indeed, Foster Mother testified that the child is particularly bonded with Foster Father and becomes upset when he is not around. Petitioners have made the child a part of their family and have done everything to meet the child's emotional, physical, and educational needs. In contrast, Mother is a stranger to the child. Thus, the trial court's determination that a change in caregivers would likely have a negative effect on the child is well-supported by the proof. This factor therefore also heavily favors termination.

The trial court further found that Mother's history of exposing the child to illegal

drugs weighed in favor of termination. *See* Tenn. Code Ann. § 36-1-113(i)(6) (involving abuse or neglect toward the child or others in the household). Here, the proof shows that the child was exposed to illegal drugs both in utero and thereafter while in Mother's care. Indeed, we have affirmed the trial court's conclusion that Mother committed severe abuse. As such, this factor strongly favors termination.

With regard to the environment of Mother's home, the trial court again looked to Mother's drug use and her failure to complete necessary drug treatment. *See* Tenn. Code Ann. § 36-1-113(i)(7). Although the trial court found that Mother's physical home was appropriate, it was again concerned with Mother's failure to complete substance abuse aftercare or a mental health assessment, both of which Mother acknowledged were necessary. As we previously noted, the evidence supports the trial court's findings as to these facts. As such, the trial court did not err in determining that this factor weighs in favor of termination.

The trial court relied on the same facts in determining that Mother's mental or emotional status would be detrimental to the child:

> The Mother had acknowledged two years ago at the time of the adjudicatory hearing that she needed to complete a mental health assessment and follow all recommendations. She made one telephone call to attempt to schedule it but was not successful. Mother has never completed intensive substance abuse counseling, which she had stipulated that she needed to complete. Mother, who is not obese by any means, has now obtained a prescription for an amphetamine substance prescribed for weight loss. Mother's failure to complete these measures within the period of two years would, in all likelihood, prevent her from effectively providing safe and stable care and supervision for the child. This factor weighs in favor of termination of the Mother's parental rights.

*See* Tenn. Code Ann. § 36-1-113(i)(7) (involving mental and emotional health). This factor is somewhat more difficult. Here, although Mother has not completed the mental health assessment, there was no testimony that she suffered from any mental health issues that prevented her from parenting the child. The proof did, of course, show that Mother had not completed the required intensive outpatient treatment that would help her maintain sobriety. Likewise, Mother's claim of long-term sobriety at trial was supported only by tests from the month prior to trial. Mother also obtained a prescription for an amphetamine without informing her medical provider of her substance abuse issues. As such, we conclude that this factor is neutral at best.

The final factor involves the question of whether the parent paid child support consistent with the guidelines. *See* Tenn. Code Ann. § 36-1-113(i)(9). Here, the proof shows that other than a few sporadic gifts, Mother did not pay any support for the child.

This factor therefore favors termination.

In sum, the vast majority of the factors at issue in this case favor termination. Importantly, the child has not visited with Mother for the majority of her life and has no meaningful relationship with her. "This Court has held that both the existence of a meaningful relationship and the lack of meaningful relationship may be considered important factors in the best interest analysis." *In re P.G.*, No. M2017-02291-COA-R3-PT, 2018 WL 3954327, at \*16 (Tenn. Ct. App. Aug. 17, 2018) (citing *In re Addalyne S.*, 556 S.W.3d 774, 795 (Tenn. Ct. App. 2018)); *see In re Jayvien O.*, No. W2015-02268-COA-R3-PT, 2016 WL 3268683, at \*9 (Tenn. Ct. App. June 7, 2016) (affirming a trial court's holding that termination was in the child's best interest where the trial court found that "'most importantly,' . . . a meaningful relationship had not been established between" the mother and child); *In re Terry S.C.*, No. M2013-02381-COA-R3-PT, 2014 WL 3808911, at \*18 (holding that termination was in the children's best interest including because, "perhaps most importantly, [the mother] has failed to maintain regular visitation with the children and therefore has no meaningful relationship with them"). In contrast, the proof shows that Petitioners have welcomed the child into their family and hope to adopt her should Mother's parental rights be terminated. Mother had months to demonstrate her sobriety, and all the while the child was being well-cared for by Petitioners. As a result, she is bonded to them. It serves no purpose for the child to wait for Mother to credibly demonstrate lasting sobriety when the only family she has ever known is presently ready and willing to adopt her. The trial court's ruling that termination is in the child's best interest is therefore affirmed.

## V. CONCLUSION

The judgment of the Washington County Juvenile Court is affirmed as to both the grounds for termination and the finding that termination is in the child's best interest. The termination of Mother's parental rights is therefore affirmed. Costs of this appeal are taxed to Appellant Leslie S., for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

- 25 -